IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Johnny Luther Ricks,            )
                                )        Civil Action No. 6:11-2106-MGL-KFM
                Plaintiff,       )
                                )        **REPORT OF MAGISTRATE JUDGE**
        vs.                      )
                                )
Michael J. Astrue,              )
Commissioner of Social Security, )
                                )
                Defendant.       )
_____)

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on March 19 and March 6, 2008, respectively, alleging that he became unable to work on May 26, 2006. The SSI application was denied initially on March 26, 2008, due to excess income. The DIB application was denied on October 21, 2008. In March 2009, the plaintiff reported that he no longer had any income, and both claims were denied upon reconsideration on June 17, 2009. On

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

August 14, 2009, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Caroll H. Crawford, an impartial vocational expert, appeared on August 5, 2010, considered the case *de novo*, and on August 20, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 21-30). The Appeals Council denied the plaintiff's request for review on April 29, 2011. The plaintiff's counsel requested an extension of time to submit new evidence. On June 14, 2011, the Appeals Council set aside the earlier action and considered additional information submitted by counsel, but the Appeals Council ultimately found no reason to review the ALJ's decision and denied the request for review (Tr. 1-11). The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council June 14, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since May 26, 2006, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: lumbar disc disease, a history of cerebral palsy, a history of bilateral knee surgeries, borderline intellectual functioning, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, crouching or climbing of ramps or stairs; and no kneeling, crawling or climbing of ladders, ropes or scaffolds.  He can sit for 6 hours in an 8-hour workday; he can stand/walk for 2 hours in an 8-hour workday.  He should not be exposed to vibration.  He can perform simple, routine work involving no frequent interaction with the general public.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7.  The claimant was born on August 12, 1975, and was 30 years old, which is defined as a younger individual age 18-44, on the alleged onset date (20 C.F.R. §§ 404.1563 and 416.963).

8.  The claimant has a limited (8th grade) education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c) and 404.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 26, 2006, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of

4

establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there

5

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 30 years old on his alleged onset date, May 26, 2006 (Tr. 118, 141). He had an eighth grade education, attending special education classes, and had worked as a chemical weigher, a cook, a yard driver, and a forklift operator (Tr. 154-57, 164, 168-69).

The plaintiff has cerebral palsy, which required several operations when he was a child on his right foot and ankle, as well as both knees. The plaintiff's right leg is about one half inch shorter than his left leg (Tr. 329).

In January 2005, he had a L5-S1 fusion for treatment of degenerative disc disease performed by Dr. Sumeer Lal. In April 2005, Dr. Lal reported that the plaintiff was "doing very well" and was "very pleased with his surgical outcome" (Tr. 301).

The plaintiff saw S.D. Pendergrass, M.D. in January 2006 and reported that he had back pain since his back surgery in January 2005. The plaintiff reported that his pain clinic stopped seeing him after he missed an appointment. The plaintiff reported that he lifted 50-75 pounds in his job with Wal Mart. After examination, Dr. Pendergrass suggested that the plaintiff needed to find a lighter duty job without so much standing and lifting (Tr. 232). Dr. Pendergrass scheduled an MRI and a follow-up appointment (Tr. 233). The plaintiff failed to show up for his scheduled appointment on March 6, 2006, and did not notify the office to cancel (Tr. 298).

The plaintiff sought treatment through workers compensation for back pain and lumbago (pain in the lumbar region) for a work injury (Tr. 284-93; *see also* Tr. 392-94). A May 2006 examination revealed the plaintiff had a normal gait and only mildly decreased range of motion in his trunk (Tr. 394). He demonstrated normal range of motion and strength in all extremities (Tr. 394-95). In June 2006, Lindsey Clarke, M.D., observed that

the plaintiff's strength was slightly less than full (4+/5) in all extremities, and straight leg tests were positive in both legs (Tr. 397). Dr. Clarke diagnosed the plaintiff with degenerative joint disease in the lumbar spine (Tr. 398). Dr. Clarke imposed work limitations on the plaintiff for two weeks, from June 5 through 19, 2006 (Tr. 399, 401).

A June 2006 MRI examination showed post surgical changes at L5-S1, but did not show spinal or foraminal stenosis or disc protrusions (Tr. 292). After reviewing the MRI, Dr. Clarke instructed his staff to "notify patient and workers' comp that MRI of L-spine was normal except for old post-surgical changes." Dr. Clarke recommended that the plaintiff continue his duty restrictions and keep his appointment that was in one week (Tr. 404). A June 2006 MRI of the plaintiff's thoracic spine showed no evidence of thoracic spine fracture or spinal cord lesion. The minimal degenerative changes at T5-T6 were not associated with stenosis (Tr. 409). Dr. Clarke noted that the MRI of the thoracic spine was "unremarkable" (Tr. 410).

At a July 2006 examination by Dr. Clarke, the plaintiff demonstrated normal range of motion and strength in all extremities, and his straight leg examination was negative bilaterally. Dr. Clarke observed that the plaintiff's pain was "somewhat out of proportion to exam" (Tr. 411).

In July 2006, Dr. Lal wrote Nurse Bennie Henderson at Family Medicine of Ware Shoals a letter stating that the plaintiff did "very, very well" after undergoing an L5/S1 fusion, having only minor sensory complaints and continuing to do well (Tr. 235). Although the plaintiff had a work injury, Dr. Lal observed that the plaintiff did not have new radicular symptoms or profound neck pain. Dr. Lal evaluated the imaging studies and found spondylosis (degenerative changes due to osteoarthritis), but saw no findings that would require surgical intervention (Tr. 235).

The plaintiff went to the hospital in August 2006 complaining of back pain (Tr. 272-83). The intake note referred to a July 2006 MRI, which showed no spinal or foraminal

7

stenosis or disc protrusions (Tr. 273). The plaintiff was referred to follow up with Dr. Lal and the pain clinic (Tr. 274).

An August 2006 x-ray of the plaintiff's lumbar spine showed "satisfactory and stable postoperative appearance following L5/S1 posterior instrumented fusion. There is no abnormal motion on flexion or extension" (Tr. 267).

In September 2006, upon referral by Dr. Lal, Phillip C. LaTourette, M.D., at an outpatient pain clinic examined the plaintiff for thoracic pain (Tr. 245-51, 296-97, 261-63). The plaintiff reported 10/10 (full) pain, with no new numbness, tingling, or weakness compared to the January 2005 surgery (Tr. 250). Examination showed significant increase in the plaintiff's pain behavior with significant antalgia and grunting with all movements (Tr. 250). He did have tenderness throughout his cervical and lumbar spine (Tr. 250). Neurological examination showed intact strength and sensation except for atrophy of his right leg and decreased strength in his right calf muscle, due to prior operations on his foot and cerebral palsy (Tr. 251).

After reviewing the plaintiff's MRIs, Dr. LaTourette stated "I am unclear as to what is causing [the plaintiff's] pain, and I do not really have any suggestions at this point in time in terms of any types of spinal injections, either for diagnostic or therapeutic reasons" (Tr. 251). Dr. LaTourette stated he was "not sure if he has had a mild sprain of his thoracic and lumbar spine"(Tr. 251). Dr. LaTourette specifically noted both the plaintiff's "significant increase in pain behavior" and the fact that the plaintiff never appeared for a scheduled follow-up in July 2005 for a possible selective nerve root injection when he saw the plaintiff a year earlier (Tr. 251).

Robert G. Schwartz, M.D. of Piedmont Physical Medicine and Rehabilitation treated the plaintiff from October 2006 to November 2007 (Tr. 321-30). In May 2007, Dr. Schwartz recommended that the plaintiff go outside more often and not be so sedentary (Tr. 327). Dr. Schwartz prescribed Cymbalta and Celebrex and administered several

8

lumbar facet region blocks to the plaintiff (Tr. 321, 325, 327).  In July 2007, Dr. Schwartz noted that the plaintiff's transportation problems precluded earlier follow-up (Tr. 325).  Dr. Schwartz's November 16, 2007, note indicated that the plaintiff had not kept 12 appointments in four months (Tr. 321).  Based on a November 2007 Lift-Trak study, Dr. Schwartz restricted the plaintiff to no lifting over 18 pounds and no repetitive below the knee activity (Tr. 321; *see* Tr. 322-24).  Dr. Schwartz noted that the medication did seem to help the plaintiff, but the injections had "not made a difference."  He stated that the plaintiff was at maximum medical improvement and that he had sustained a 17% impairment to the spine (Tr. 321).

In February 2008, the plaintiff underwent a functional capacity evaluation (Tr. 383-89).  The plaintiff demonstrated the ability to sit, lift, carry, static bend, and dynamic reach.  He did not demonstrate the ability to stand, climb stairs, dynamic bend, kneel, squat, reach above his shoulders, walk, and twist (Tr. 388).  During examination with isometric grip testing, bending, and reaching, the plaintiff demonstrated inconsistent effort (Tr. 389).

In March 2008, the plaintiff was seen by Nurse Henderson.  He reported he was dismissed from care by Dr. Schwartz and wanted pain medication.  Upon examination, Nurse Henderson observed that the plaintiff did not appear in acute distress.  He was given prescriptions for Cymbalta, Ambien, Skelaxin, and Mobic.  Because of a missed appointment, the plaintiff was given a dismissal letter from the Ware Shoals Center for Family Medicine (Tr. 436-38).

James Phillips III, Ph. D., performed a mental consultative examination of the plaintiff in September 2008 (Tr. 448-51).  The plaintiff reported that he took Cymbalta, given to him by his primary care physician (Tr. 449).  After examination, Dr. Phillips diagnosed the plaintiff with major depression and opined that the plaintiff could learn simple information and instructions, but that his depression and pain would distract him such that he would need more repetitions than average to learn.  Dr. Phillips further opined that, at the time of

9

the evaluation, the plaintiff had little interest in seeing other people and would not tolerate a lot of interpersonal contact in a work situation (Tr. 451).

In October 2008, Craig Horn, Ph.D., a State agency psychologist, opined that the plaintiff's mental impairments did not meet or equal a listed impairment, that the plaintiff had "mild" limitations in his activities of daily living and "moderate" limitations in maintaining social functioning and in maintaining concentration, persistence, and pace (Tr. 462). Dr. Horn also completed a mental residual functional capacity assessment and opined that the plaintiff was able to understand, remember, and carry out short and simple instructions and retained the ability to make simple work-related decisions (Tr. 466-68). Dr. Horn also opined the plaintiff could ask simple questions and request assistance from peers or supervisors, but would perform best in situations that did not require ongoing interaction with the public (Tr. 468).

The record contains one report from Good Shepherd Free Medical Clinic, in January 2009, where Peter Partee, M.D., discussed with the plaintiff getting him on Cymbalta (Tr. 565).

Melissa K. Richardson, M.D. performed a physical consultative examination of the plaintiff in May 2009 (Tr. 470-74). On examination, Dr. Richardson observed that the plaintiff had full (5/5) in all upper muscle testings, except the right lower extremity, which was slightly less than full (Tr. 471). Dr. Richardson noted the plaintiff's history of cerebral palsy, but found no spastic pattern (Tr. 472). His right muscle atrophy and leg length discrepancy were consistent with his history of congenital abnormalities in his right leg (Tr. 472). She did not detect active synovistis on examination, despite his allegation of rheumatoid arthritis and she found no upper extremity weakness (Tr. 472).

A State agency psychologist, Gary Calhoun, reviewed the plaintiff's record and completed a mental residual functional capacity assessment in June 2009 (Tr. 478-95). Mr.

10

Calhoun found the same level of "B criteria" limitations as Dr. Horn (Tr. 488).[2]   Mr. Calhoun's recommendation on the residual functional capacity assessment was consistent with Dr. Horn's opinion:  The plaintiff was able to understand, remember and carry out short and simple instructions and retained the ability to make simple work-related decisions; the plaintiff could ask simple questions and request assistance from peers or supervisors, but would perform best in situations that did not require on-going interaction with the public. While the plaintiff's symptoms were severe, the medical consultant opined they did not preclude him from performing simple, routine work activities away from the general public (Tr. 494).

In October 2009, the plaintiff was hospitalized for suicidal ideation (Tr. 505-33).  Nancy L. Voight, Ph.D., evaluated the plaintiff for suicidality, personality, and IQ on October 1, 2009 (Tr. 507-09).  After examination, Dr. Voight determined that the plaintiff appreciated that he did not want to leave a legacy of suicide for his child (Tr. 507).  She assessed the plaintiff as having a 4-6th grade reading ability and a borderline IQ (Tr. 508). Her impression was that a "mild suicidal risk continue[d] to exist."  Dr. Voight stated that the plaintiff did "not always understand others' behavior and his current negativity, cynicism, and suspicion is limiting his functioning."  She felt that the plaintiff's borderline IQ was a "significant influence" in the plaintiff's functioning and opined that the plaintiff's IQ level would "make it hard for him to find a job other than manual labor which he may not be able to perform" (Tr. 508).

Teresa Bishop, M.D., completed the plaintiff's discharge summary and assigned him a Global Assessment of Functioning ("GAF") rating of 60, which is at the upper range of moderate symptoms or moderate difficulty in social occupational or school functioning (Tr. 510). *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of*

---

[2]  Those findings were "mild" limitations in his activities of daily living and "moderate" limitations in maintaining social functioning and in maintaining concentration, persistence, and pace (Tr. 488).

*Mental Disorders* 34 (4th ed., text revision 2000) ("DSM-IV-TR").  He was given a two-week supply of medication for his depression (Cymbalta) on discharge (Tr. 512).

The plaintiff appeared with an attorney when he testified at the hearing before the ALJ on August 5, 2010 (Tr. 36-53).  He lived independently and had worked as a paddle operator and at the Wal-Mart distribution center as a yard driver and a forklift operator (Tr. 37-39).  Although the plaintiff attended school only through the eighth grade, in special education classes, he had a driver's license and took the test on a computer, where he was able to read well enough to take the test (Tr. 37-38).

The plaintiff testified that he stopped working after a work accident, where lumber fell onto the forklift he was working with the jarring of the forklift resulting in an injury (Tr. 40-41).  He had pain in his lower back, knees, and right leg (Tr. 47).  He was able to walk about 100 yards at a time (Tr. 48).  The plaintiff stated that his right leg went numb three to four times a day (Tr. 50).  He said he was restricted to lifting five pounds (Tr. 49).  The plaintiff testified that he has had depression since he was a child and that it resulted in him having a negative outlook (Tr. 44-45).  He stayed to himself and preferred to stay at home (Tr. 45).  He testified that he did not have money to buy Cymbalta that had been prescribed for his depression and chronic pain (Tr. 45).

Carroll H. Crawford testified as a vocational expert (Tr. 53-57).  The vocational expert classified the plaintiff's past work as medium semi-skilled work (Tr. 55).  The ALJ presented the vocational expert with a hypothetical individual who was the same age, with the same education and work experience as the plaintiff, who was limited to lifting at the light exertional level; sitting for six hours; standing and walking for two hours; limited to no kneeling or crawling, no exposure to vibration, and no climbing ladders, ropes, or scaffolds; limited to occasionally stooping, crouching, and climbing ramps or stairs; and restricted to simple, routine work with less than frequent public contact in the work place (Tr. 55-56).  In response to the hypothetical individual and ALJ's question, the vocational expert testified

12

that unskilled, sedentary jobs existed in significant numbers in the national economy the hypothetical individual could perform (Tr. 56).

## ANALYSIS

The plaintiff alleges disability commencing May 26, 2006, at which time he was 30 years old. He was 34 years old at the time the ALJ's decision was issued. The plaintiff finished the eighth grade and was in special education. The ALJ found that the plaintiff's lumbar disc disease, cerebral palsy, bilateral knee surgeries, borderline intellectual functioning, and depression were severe impairments. The ALJ further determined that the plaintiff could perform work with restrictions that require no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, crouching or climbing of ramps or stairs; and no kneeling, crawling or climbing of ladders, ropes or scaffolds. In response to the ALJ's hypothetical, the vocational expert identified the sedentary, unskilled occupations of nut sorter and bench hand as occupations such an individual would be able to perform. The plaintiff argues the ALJ erred in (1) summarily dismissing and failing to properly address certain medical opinions; and (2) failing to evaluate his claim of lack of financial resources as a reason for not pursuing treatment or prescription medication. The plaintiff further argues that the Appeals Council erred in failing to weigh the newly produced medical opinions in order to reconcile the new evidence with other evidence in the record.

### *Medical Opinions*

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in

13

which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff first argues that the ALJ erred in summarily dismissing the opinion of treating physician Dr. Schwartz and the results of a functional capacity evaluation ordered by him. Based on a November 2007 Lift-Trak study, Dr. Schwartz restricted the plaintiff to no lifting over 18 pounds and no repetitive below the knee activity (Tr. 321; *see* Tr. 322-24). Dr. Schwartz noted that medication did seem to help the plaintiff, but the injections had "not made a difference." He stated that the plaintiff was at maximum medical improvement and that he had sustained a 17% impairment to the spine (Tr. 321). In

14

February 2008, the plaintiff underwent a functional capacity evaluation upon a referral by Dr. Schwartz (Tr. 383-89). The plaintiff demonstrated the ability to sit, lift, carry, static bend, and dynamic reach. He did not demonstrate the ability to stand, climb stairs, dynamic bend, kneel, squat, reach above his shoulders, walk, and twist (Tr. 388). During examination with isometric grip testing, bending, and reaching, the plaintiff demonstrated inconsistent effort (Tr. 389).

> The ALJ found as follows:
>
> In connection with formal functional capacities evaluation on February 20, 2008, the claimant demonstrated the ability to sit for 30 minutes, lift and carry 11 to 12 pounds, static bend for five minutes and reach repetitively. He did not demonstrate the ability to stand for 30 minutes, climb stairs, bend or twist repetitively, kneel or squat for two minutes walk for 10 minutes, or repetitively reach above his shoulder. Inconsistent effort in conjunction with some testing was noted (Exhibit 6F).
>
> Testing to determine an individual's functional capacity is reliable only to the extent an individual gives full effort. No assessment of the claimant's effort in connection with testing in November 2007 is indicated, but inconsistent effort is noted in connection with testing in February 2008. Consequently, I give limited weight to the results of formal testing and to Dr. Schwartz's opinion.

(Tr. 25).

The ALJ acknowledged that there was no assessment of effort in the November 2007 test on which Dr. Schwartz based his opinion (Tr. 25). However, the ALJ questioned the validity of the test results, pointing out that the plaintiff demonstrated an inconsistent effort in connection with the same type of testing that occurred only four months later (Tr. 25, 379, 381, 388-89).

The plaintiff next argues that the ALJ erred by "selectively pick[ing]" the limitations imposed by Dr. Phillips, who conducted a mental status examination of the plaintiff on September 3, 2008. Dr. Phillips diagnosed the plaintiff with major depression

and opined that the plaintiff could learn simple information and instructions, but that his depression and pain would distract him such that he would need more repetitions than average to learn.  Dr. Phillips further opined that, at the time of the evaluation, the plaintiff had little interest in seeing other people and would not tolerate a lot of interpersonal contact in a work situation (Tr. 451).

> The ALJ stated as follows:
>
> Dr. Phillips['] opinion as to the vocational impact of borderline intellectual functioning is given virtually no weight but I do give considerable weight to his opinion as to the functional limitations indicated; that is, that the claimant can learn simple information and instructions and that he would not be able to tolerate a lot of interpersonal contact in a work situation.

(Tr. 27).

The plaintiff asserts the ALJ erred by selectively picking the functional limitations he chose to accept from Dr. Phillips' opinion.  Specifically, the plaintiff argues the ALJ omitted his need for "quite a few repetitions beyond average" to learn simple information and instructions because his "psychiatric condition and pain . . . destroy his concentration"  (pl. brief 7; see Tr. 451).

The plaintiff also argues the ALJ erred by not discussing Dr. Voight's entire examination record.  Dr. Voight evaluated the plaintiff for suicidality, personality, and IQ during his hospitalization in October 2009 for suicidal ideation (Tr. 507-09).  Dr. Voight determined that the plaintiff had a mild suicide risk (Tr. 507).  She assessed the plaintiff as having a 4-6th grade reading ability and a borderline IQ (Tr. 508).  She further opined that the plaintiff's IQ level would make it hard to find a job other than manual labor (Tr. 508). The ALJ noted Dr. Voight's findings but did not explicitly give weight to Dr. Voight's opinion that it would be hard for the plaintiff to find a job other than manual labor because of his IQ (see Tr. 26).

16

The plaintiff next argues that the ALJ ignored Dr. Pendergrass' January 30, 2006, statement that the plaintiff needed to have a "lighter duty job [without] so much standing, lifting, etc." (pl. brief 9; *see* Tr. 232). The plaintiff reported to Dr. Pendergrass that he lifted 50-75 pounds in his job with Wal Mart (Tr. 232).

As will be discussed below, this court finds that remand is necessary for the fact finder to weigh the newly produced medical evidence submitted to the Appeals Council and to reconcile this with other evidence previously in the record. Accordingly, on remand, the ALJ will necessarily need to reevaluate the prior findings regarding the weight given to the above medical opinions in light of the newly produced evidence.

***Financial Resources***

The plaintiff argues that the ALJ erred in not taking his inability to afford medical treatment into consideration (pl. brief 20-22). The Commissioner argues that the ALJ did not rely on the plaintiff's lack of treatment to deny benefits, but rather correctly acknowledged it as one of the factors to consider when assessing credibility (def. brief 21-23).

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional

17

limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. It "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)   the individual's daily activities;

(2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)   factors that precipitate and aggravate the symptoms;

(4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

In making his credibility finding, the ALJ stated:

18

> Considering that the claimant's leg length discrepancy is congenital and that, despite his multiple foot and leg surgeries, he worked for many years in jobs requiring a great deal of standing/walking and/or the operation of foot pedals; *his inconsistent compliance with pain management therapy; the absence of frequent emergency room visits for pain; the absence of any treatment after February 2008 until January 2009 and no back-related treatment after January 2009 through, at least, the date of the hearing*; *and the absence of ongoing treatment by a mental health professional*, I find that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. 28) (emphasis added).

It is well settled that a claimant for Social Security benefits should not be "penalized for failing to seek treatment [he] cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir.1986). Social Security Ruling 96-7p acknowledges that an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7P, 1996 WL 374186, at *7. However, when a claimant asserts that he has not pursued medical treatment because of a lack of financial resources, the ruling admonishes a fact finder from drawing "any inferences about an individual's symptoms and their functional effects" from a failure to pursue medical treatment "without first considering any explanations that the individual may provide . . . ." *Id*. Among the examples provided by the ruling is the situation where the claimant "may be unable to afford treatment or may not have access to free or low-cost medical services." *Id*. at *8.

There is evidence in the record that the plaintiff missed many medical appointments (*see* Tr. 321 (Dr. Schwartz: the plaintiff missed 12 appointments in four months); Tr. 251 (Dr. LaTourette: the plaintiff failed to show up for a followup and possible

spinal injection in July 2005); Tr 298 (Dr. Pendergrass: the plaintiff failed to show up for appointment in March 2006); Tr. 232 (Dr. Pendergrass: noting the plaintiff's treatment was discontinued with a pain clinic because he missed an appointment)). However, there is also evidence that the plaintiff lacked financial resources to pay for medications and to seek treatment. In the hearing before the ALJ, the plaintiff testified that he was on Cymbalta prescribed by Dr. Schwartz for both depression and pain. When asked by counsel, "Do you have the money to buy it", he replied, "No, ma'am." In a second exchange, counsel asked, "Now, I understand that you went to the Beckman (phonetic) Center and at Shepard, were they able to do anything for you." The plaintiff replied, "No, ma'am. At Shepherd, they couldn't, something about, you know, it's a free clinic and whatever and the Cymbalta is so high and that's why I couldn't get it then because they didn't have it, they couldn't get, get the medication in (INAUDIBLE) mental practice . . . " (Tr. 45). In response to a question from the ALJ, he replied, "They couldn't get my Cymbalta that I was needing. It was high for them to get, you know, in order for me to get it, you know, for $20, that's what it was going to cost me for my prescription and they said they couldn't get it for me" (Tr. 53). In a history taken by Dr. Voight during the 2009 psychiatric hospitalization, the psychologist recorded, "He had a settlement from this injury and says that people wanted to be around him when he had money but now that money is gone, his friends and family are also gone" (Tr. 507). During the same hospitalization, under "current medications," an interviewer wrote, "Supposed to be on Cymbalta 120 mg daily- helps but can't afford" (Tr. 515). In separate progress notes, Dr. Schwartz noted that "transportation problems have precluded earlier follow-up" and "Car trouble has precluded earlier follow-up" (Tr. 325). Also, in new evidence submitted to the Appeals Council that will be discussed below, the report of Dr. Kirby stated, "Because of his pain and financial difficulties from not being able to work, he suffers from major depression and has been hospitalized at Self Memorial in Greenwood

20

and in Patrick Harris Psychiatric Hospital in Anderson."  Furthermore, Dr. Kirby recorded, "He has had some difficulty getting his medication because of the lack of money" (Tr. 227).

Here, in assessing the plaintiff's credibility, the ALJ drew a negative inference from the plaintiff's failure to comply with pain management treatment and the absence of ongoing treatment by a mental health professional.  The ALJ did so without considering the plaintiff's alleged lack of financial resources, as required under SSR 96-7p, that may explain infrequent or irregular medical visits or failure to seek medical treatment. Accordingly, upon remand, the ALJ should be directed to address the issue of the plaintiff's financial condition and the alleged impact on his failure to pursue treatment and purchase prescribed medication.  To the extent the ALJ on remand continues to consider the plaintiff's failure to pursue medical treatment as evidence weighing against his credibility, it is necessary that specific factual findings be made concerning what resources were available to the plaintiff and whether his alleged inability to pay for treatment and prescription medications contributed to his failure to seek medical treatment for his various impairments. *Johnson v. Astrue*, C.A. No. 8:10-2716-RMG, 2012 WL 393257, at *5 (D.S.C. Feb. 6, 2012).

### Appeals Council Evidence

The plaintiff argues that the Appeals Council erred in failing to weigh the newly produced medical opinions presented to it and to reconcile this new evidence with other evidence in the record. The Appeals Council denied the plaintiff's request for review on April 29, 2011.  The plaintiff's counsel then requested an extension of time to submit new evidence.  On June 14, 2011, the Appeals Council set aside the earlier action and considered additional information submitted by counsel, but the Appeals Council ultimately found no reason to review the ALJ's decision and denied the request for review (Tr. 1-11).

The administrative scheme for handling Social Security claims permits the claimant to offer evidence in support of the claim initially to the ALJ. Once the ALJ renders a decision, the claimant is permitted to submit new and material evidence to the Appeals

21

Council as part of the process for requesting review of an adverse ALJ decision. 20 C.F.R. § 404.968, 404.970(b). This new evidence is then made part of the record. The regulations, however, do not require the Appeals Council to expressly weigh the newly produced evidence and reconcile it with previously produced evidence before the ALJ. Instead, the Appeals Council is required only to make a decision on whether to review the case and, if it chooses not to grant a review, there is no express requirement that the Appeals Council articulate its rationale. *Meyer v. Astrue*, 662 F.3d 700, 705-06 (4th Cir.2011). As the Fourth Circuit addressed in *Meyer*, the difficulty arises under this regulatory scheme on review by the courts where the newly produced evidence is made part of the record for purposes of substantial evidence review but the evidence has not been weighed by the fact finder or reconciled with other relevant evidence. Under the particular facts presented in *Meyer*, the court determined that the new evidence in that case was not "one-sided" and that upon consideration of the record as a whole, the court could not determine whether substantial evidence supported the ALJ's denial of benefits. *Id*. at 707. In *Meyer*, the ALJ determined that the record lacked certain evidence the ALJ deemed critical; the plaintiff subsequently obtained this evidence and presented it to the Appeals Council. *Id*. On this record, the Fourth Circuit concluded that "no factfinder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id*. Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the case had to be remanded to the ALJ for further fact finding. *Id*.

Here, the plaintiff submitted seven exhibits to the Appeals Council (*see* Tr. 5). Exhibits 16E (Tr. 214-17) and 17E (Tr. 218-23) are argument and procedural, and the plaintiff admits that Exhibits 23F (Tr. 569-70) and 24F (Tr. 571-73) do not contain any evidence relative to the period on or before the date of the ALJ's decision (pl. brief 14). However, the plaintiff argues that the Appeals Council should have weighed the newly

22

produced medical opinions in Exhibits 18E, 22F, and 23F in order to reconcile this new evidence with other evidence in the record. Exhibits 22F and 23F are 2011 handwritten reports from Dr. Vincent S. Toussaint (Tr. 567-70).  In the first report dated January 27, 2011, Dr. Toussaint stated, "When he worked there were always complaints (sometime 20 in one night shift) of having 'freight mixed' or 'in the wrong place.'" "Also he could not fill out the necessary paper accurately resulting in much and continuous confusion within the company." Dr. Toussaint noted further, "cerebral palsy as in his case interferes with motor skills, makes him clumsy" (Tr. 567-68). In the second report, dated May 13, 2011, Dr. Toussaint addressed the issue of pain, gait, and spasticity and assigned a specific medical diagnosis for each limitation. He cited "static encephalopathy" with both physical and mental disabilities."  The symptoms attributable to static encephalopathy were all on the right side and included spasiticity of the quadriceps, pronator spasiticity at the elbow, and hemiplegic type gait abnormality, with short leg limp on the right. Dr. Toussaint attributed chronic pain to status post triple arthrodesis, plantar fascia release, and heel cord lengthening (Tr. 570). The plaintiff argues that the ALJ's decision addressed the issues of pain and spasticity (*see* Tr. 26, noting that "Dr. Richardson reported that the claimant demonstrated no spasticity despite a history of cerebral palsy . . ."), and Dr. Toussaint's report is in conflict with those findings.

Exhibit 18E is a report from an evaluation by Thomas F. Kirby, Ph.D., dated February 7, 2011, to assess the plaintiff's level of adaptive behavior to determine whether the plaintiff was eligible for services through the South Carolina Department of Disabilities and Special Needs ("DDSN") (Tr. 225-29).  It was determined that the plaintiff was eligible for DDSN services under the Related Disabilities category for cerebral palsy (Tr. 225). As noted by the plaintiff, the Laurens County Disabilities and Special Needs Board used the State mandated criteria, all of which had to exist prior to age 18 (intellectual disability) or age 22 (related disability) to determine that the plaintiff was eligible for DDSN services. *See*

http://ddsn.sc.gov/consumers/divisions/Pages/IDRD.aspx. Dr. Kirby concluded that the plaintiff's adaptive function was near the lower limit of the moderate range. In the history, Dr. Kirby stated, "Because of his pain and financial difficulties from not being able to work, he suffers from major depression and has been hospitalized at Self Memorial in Greenwood and in Patrick Harris Psychiatric Hospital in Anderson."  Furthermore, Dr. Kirby recorded, "He has had some difficulty getting his medication because of the lack of money." (Tr. 228-229).  The plaintiff argues that this evidence impacts the considerations of the plaintiff's cerebral palsy, borderline intellectual functioning, and adaptive functioning, which were all discussed by the ALJ in his decision (Tr. 23-26).  The plaintiff further argues that the new evidence discussed above supports the existing opinions and limitations in the record by Dr. Schwartz (Tr. 320-330), Dr. Phillips (Tr. 448-451), Dr. Voight (Tr. 507-509), and Dr. Pendergrass (Tr. 232-33), and the Lift-Trak Study and functional capacity evaluation ordered by Dr. Schwartz (Tr. 331-390).

This court finds that remand is necessary for the fact finder to weigh the newly produced medical evidence and to reconcile this with other evidence previously in the record.  On remand, the ALJ will necessarily need to reevaluate the prior findings regarding the plaintiff's credibility and weight given to the medical opinions in light of the newly produced evidence.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 9, 2013
Greenville, South Carolina

24